The structure of the CFPB is unprecedented and unconstitutional. Never before in American history has Congress given so much executive power to a single individual who does not answer to the President. By significantly limiting the President's ability to remove the CFPB's director, Congress violated the core presidential prerogatives to exercise the executive power and to take care that the laws be faithfully executed. This Court has recognized and reaffirmed the principle that the Constitution empowers the President to keep principal officers accountable by removing them at will. While the Court created a narrow exception in Humphrey's executor in the context of a multi-member commission, it has since distanced itself from the reasoning of that decision, and there is no valid basis for extending it to the CFPB. The Court should also reject Amicus's proposed test, seemingly based on Morrison v. Olson, which would extend Morrison to principal officers and permit significant limitations on the President's ability to remove even his closest advisors. Now, as to the question of remedy, the Solicitor General contends that the Court should rewrite the Dodd-Frank Act to give the President the director, but the constitutional question in this case arises in the context of a defense to an enforcement proceeding and not a facial challenge. The Court can provide complete relief by invalidating the civil investigative demand and reversing the judgment below. In any event, the text and context of the Dodd-Frank Act make clear that Congress wanted to create an agency that was independent to the fullest extent possible and not to vest vast power in an agency that was subject to presidential control or without any congressional control over its funding. The government's proposed remedy would have the perverse effect of making the CFPB less independent than agencies it was replacing. The Court should leave to Congress the quintessentially legislative task of deciding how to fix the CFPB's defective structure. Mr. Shanmugam, this case has a kind of an academic quality to it. The demand in question was ratified by an acting head who was subject to the President's removal power without qualification. I don't see how the composition of the Bureau affects your client, since your client, with the adverse action, is now attributable to someone who the President could remove at will. And I don't see how differently you would be affected if the same thing were to occur with the President having the power to remove at will. So whatever might have been with the Board head that was responsible for this demand, the acting head is fully removable by the President. Justice Ginsburg, there is a live dispute between us and the government. We don't believe that there is a live issue on ratification, not least because when the government raised this issue below, it presented no evidence, no factual evidence, that the acting director in fact ratified the civil investigative demand. But where we agree with the government is that at most that would be an issue that would be live on remand. And the issue of ratification was raised at the certiorari stage, and both we and the government agree that that is not a live issue before the court. Where we disagree is that the government is trying to resuscitate that as a potential argument that it could make on remand. But in terms of this Court's traditional jurisdictional doctrines, there is a live dispute, and therefore there is no mootness here. And we plainly have standing, including standing to appeal, because our injury is the fact that my client is subject today to a civil investigative demand that even today the government is seeking still to enforce. But you would be harmed in the very same way if the President had the full removal power. If the President had the full removal power, and then a properly appointed and removable director sought to enforce the civil investigative demand against us, then sure, we would no longer have the argument that we are making now. But this Court time and again has said that where an action has been taken by an unaccountable executive official, that creates a here and now injury, and an injury that a private individual can vindicate. Where the separation of powers has been violated, a private individual, no less than an aggrieved removed official, has the ability to raise that issue. My problem is more somewhat like Justice Ginsburg's. But you started by saying an unprecedented agency. Well, there is at least two others, the Office of Special Counsel and the Social Security Administration, which have single heads subject to some limitations on their removal. And I see the Social Security Administration being as powerful, if not more powerful, than this agency, because the Social Security Administration affects virtually every American. This agency is limited to the financial market, and with respect to the amount of money that it distributes or can seek restitution on, it's comparable to the Social Security Administration. So I don't think this is so unprecedented, as you claim. I would differ with you, Justice Sotomayor, only in that I do think that the level of executive power wielded by the CFPB is unprecedented, precisely because it takes enforcement action. The Social Security Administration unquestionably affects millions of Americans. But one thing it doesn't do is to take enforcement action. It poses no threat to individual liberty. And as you are aware, the Social Security Administration was turned into a single-director agency with only four-cause removal relatively recently. Indeed, independent agencies with four-cause removal restrictions more generally are of comparatively recent vintage. These sorts of single-director agencies are even more recent. Given that your client is not the President, it seems to me that the person who should be complaining is the President, not your client. Shouldn't we address the severability question and leave for another day the issue that would cause harm, i.e., shouldn't we address severability first if we find this severable? Then it's academic whether the President has power, and shouldn't we do what we've done for over 200 years of this country and wait until there's an actual dispute between the President and a director that he or she wants to fire? This Court in the modern era has not required there to be a contested removal. There was no such contested removal in Morrison or Bausch or Free Enterprise Fund, and that is because, as this Court stated in Bond, the separation of powers creates an injury that a private party can vindicate because an actual... That's not my point. My point is, isn't it mooted here if we find this severable? No. And I want to address that directly because that is a suggestion that is made in the amicus brief filed by Professor Harrison. And the fundamental problem with the suggestion that the Court can somehow resolve the question by addressing severability first is that that would in no way validate the civil investigative demand in this case. Even if there is severability, there is still a civil investigative demand that was issued by a director who at the time was unaccountable. And this Court's cases, Bausch or Lucia and others, make clear that when you have an action taken by an unaccountable official or an official who is, you know, either improperly appointed or is subject to an improper removal restriction, that action is void, full stop. And that is why we submit that on the question of remedy, the appropriate remedy here is simply to invalidate the civil investigative demand and to stop. That is the more modest remedy here than proceeding to the question of severability. Speaking about modesty, this is a very modest restraint. Inefficiency, malfeasance, it stops the President from at whim removing someone, replacing someone with someone who is loyal to the President rather than to the consumers that the Bureau was set up to serve. And you talked about liberty. Now whose liberty are we speaking of? What about the consumers? And Congress passed this law so that the consumers would be better protected against financial fraud. And you're talking about, I suppose, the liberty of their client. But what about the people that Congress was concerned about, that is the consumers, who were not well protected by the array of agencies that were handling these problems? So two points in response to that, Justice Ginsburg. The first is that the four-cause removal restriction here, the inefficiency, neglect of duty, and malfeasance standard, has never been understood to be a modest standard and certainly cannot be read to permit what we think the Constitution requires, namely that the President be able to remove a subordinate not just because of policy disagreements, but because the President has lost faith in the official's judgment, or because the President wants someone of his or her own choosing. But I think second, to the extent that we're talking about Congress's goal here, there is abundant evidence that what Congress was trying to do was to create an agency that precisely because of its desire to protect consumers was insulated from political control to the fullest extent possible. As Elizabeth Warren, who was really the progenitor of the CFPB, said at the time, if Congress did not create an agency with functional independence, quote, my second choice is no agency at all and plenty of blood and teeth left on the floor. And so if this Court is considering what the hypothetical Congress, what Congress would have hypothetically wanted at the time of the Dodd-Frank Act, I don't think that what Congress would have wanted was the creation of an agency that was fully subject to the I think Justice Ginsburg's point included what the standard would be like, the inefficiency, malfeasance, whatever. And I don't think we've done this in prior cases, but wouldn't the normal principles of constitutional avoidance suggest that we might want to scrutinize a little bit how rigorous a limitation that is before we get to the point of striking down the statute? I mean, just take inefficiency. I mean, the President might determine that a particular approach of the agency to consumer protection was not as efficient as another approach. And I don't know why you couldn't say that that's a ground of efficiency that he could act upon. And theoretically, I don't know that the courts would be terribly suited to second-guess that judgment. Mr. Chief Justice, I don't think that that term has ever been understood that broadly. And of course, this Court has a long history of dealing with the inefficiency, neglect, and malfeasance standard dating back to Humphrey's executor. And I would refer the Court to Judge Wilkins' concurring opinion in the D.C. Circuit in PHH, which I think walks through each of the terms and explains why what those terms really require is something closer to outright incompetence. And not surprisingly, presidents have only very rarely invoked their authority at all to remove officers under that standard. But if this Court were to somehow convert that standard into what we think it constitutionally would need to be, which is effectively an at-will standard, then sure, that would have essentially the same effect as overruling Humphrey's executor, because it would permit presidents, where they disagree with the policy priorities of these officials, to remove them. On severability, what do you do with the text of the severability clause? You mentioned that we would be rewriting the Dodd-Frank Act, but wouldn't we be rewriting it by ignoring the text of the severability clause? I don't think so, Justice Kavanaugh. I'm mindful of your opinion when you were on the D.C. Circuit on this issue. I would say two things. The first is that I think that the text of the boilerplate severability clause in the Dodd-Frank Act can be read to say, in essence, only that if you strike an invalid constitutional provision, the entirety of the remainder of the Act shall not fall. And part of the reason why you may want to give the boilerplate provision that interpretation is because of the more specific severability provision in Title V, which I think by the government's own concession would be rendered superfluous if you don't adopt our proposed meaning. But if you disagree with me on that, I do have a second point, which is that this Court has consistently made clear that severability clauses create only a presumption. After all, they are, as this Court has indicated, an aid in determining the intent of a hypothetical Congress. And here, I would respectfully submit that the presumption is a weak one, because on the one hand, you have a boilerplate severability clause, which covers the entirety of the Dodd-Frank Act. And on the other hand, you have very specific indicia in Title X itself. The very first— The Court said that back in an era when we didn't pay as much attention to the text of the statute. And the text of the statute here has a severability clause. This Court has never treated severability clauses as dispositive. And I think that that is because of the nature of the severability inquiry, which is a hypothetical inquiry. It's not quite like ordinary statutory interpretation. And here, I am not just relying on statements in the legislative history. I'm relying on the text of Title X itself. And in the very provision creating the CFPB, Congress describes it as an independent bureau. There are the other provisions of the CFPB, which very unusually insulate the CFPB from the appropriations process. And so, to the extent that this is an inquiry into congressional intent, this Court should have serious pause about going so far as to render this agency subject to complete presidential control when we know that that's not what the Sponsors of Development Act wanted. Your argument rests mostly on this distinction between multi-member and single-member agencies. And I think most people who have been in these agencies or have studied these agencies, have observed these agencies, might say that that distinction is that it's kind of simplistic, that it all depends, that there are so many contingencies involved as to which kind of agency a president might have more effective influence over, that one simply can't make a general statement of that kind. There are voting rules. There are rules about whether there's a weak chair or a strong chair. There are rules about holdover commissioners. There are a thousand things that go into whether a president has influence over any particular agency, of which the question, is it one or multiple members, is not so important. Could you please spend a couple of sentences? Great. Thank you. I'm happy to turn to the merits for a minute. On Humphrey's executor, which is really the primary case on which amicus relies, I think we're all here trying to make sense of Humphrey's executor, knowing that in Morrison, this court essentially disemboweled the reasoning of that case. And I think that it is at least implicit in Humphrey's executor that the court was focused on the fact that the FTC was a multi-member commission, and as we explain, ex ante, recognizing that there are variations in how multi-member commissions are structured. We believe that multi-member commissions pose a much lower threat to individual liberty and give presidents a somewhat greater degree of control. And so our fundamental submission on the constitutional merits here is that the court can plausibly limit Humphrey's executor to that context. If the court does not accept that distinction, then I think it is squarely presented with the question of whether to overrule Humphrey's executor. But we don't believe that the court needs to reach that question. Thank you, counsel. General Francisco. Mr. Chief Justice, and may it please the court. As a general rule, the president has the unrestricted authority to remove principal officers. Humphrey's executor recognizes an exception for multi-member commissions, but that shouldn't be extended to single-headed agencies for two reasons. First, there would be no coherent limiting principal. The only difference between the FTC and most cabinet agencies is the multi-member structure. If that's irrelevant, then Congress could presumably impose forecaused removal restrictions on almost the entire cabinet, from Treasury to the EPA. Second, that in turn would sever executive power from political accountability. The president stands for election. The director of the CFPB does not. So if the director is insulated from presidential oversight, then her exercises of executive power are insulated from democratic control. And that's not the structure that our Constitution creates and requires. Mr. Chief Justice, I'd like to initially address the meaning of the forecaused removal standard. Before you do that, may I ask, isn't it uncommon for the Department of Justice not to defend the statute passed by Congress? How often has the SG declined to defend legislation adopted by Congress? Your Honor, I don't have the precise number, but the general rule is that we defend the acts of Congress unless it infringes upon the president's own executive power. And here we believe that we have a statute that infringes upon the president's own executive power. Has that been the position of the Department of Justice, or is this a new position? I believe that that is the longstanding position of the Department of Justice, that the general presumption that we will defend acts of Congress has an exception built in when the act of Congress infringes upon the president's own executive power. And that's what we have here. I mean, in this particular context, in the context of a restriction on the president's removal power. Your Honor, I don't know the exact answer to that question. I believe, although I'd want to double check on this, that in Bousher, the executive branch did not defend the removal restriction that was at issue. I believe in Free Enterprise Fund, they did defend the removal restriction at issue. I cannot recall what their position was in Humphrey's executor. In Myers, I don't believe they defended the removal restriction that Congress had enacted. General, isn't it true that the Department of Justice has refused to defend the constitutionality of other federal statutes, even when the president's removal power is not at issue? Yes, Your Honor. For example, the Defense of Marriage Act? All I'm simply saying is that our general rule is that there is a presumption that we will defend acts of Congress when arguments can reasonably be made in their defense. And there's obviously room in the joints there, but there's an exception to even that presumption when the president's own powers are at stake. And Mr. Chief Justice, as to the scope of the four-cause removal restriction, we think that the one thing that it cannot be interpreted to allow is the president to remove a principal officer simply because he has lost faith in their judgment, or simply because even though the current principal officer is perfectly good, he thinks he can do better. And we think that's critical, because the president cannot personally exercise all executive power. So the way that he does it is he puts in place people who have his implicit trust, and then he is fully accountable for their decisions precisely because he can remove them for any reason. And the problem with these four-cause removal restrictions is that they vest executive power in an individual who is not ultimately accountable for their decisions. I've always thought, and I don't, I would like a, what I've always thought, and these cases are hard to put in boxes, but look, the reason Taft could remove the postmaster is because at that time a postmaster was a political plumb, and the president is a politician, and therefore there is no good reason to stop him from controlling political plumbs. The reason they couldn't to Humphrey's executive is because this is meant to be an independent board, and Frankfurter explains it well in Myers. He says if you have an agency that has something of an adjudicative function, you need to keep them insulated. Now once we depart from that kind of thing, trying to figure out what works, a workable government says the Constitution, certainly by implication. It's impossible. What about the Fed? What about the FCC? The only thing you can say about those is there are very strong reasons for giving them some independence in terms of the workability of their function. Now that notion, case by case, look at it. I haven't been able to find another. You are another standard. Well, I'd offer you two responses to that, Your Honor. First of all, I think you can leave Humphrey's executor exactly where it is applying to multi-member commissions and you don't call into question any of the current multi-member commissions, but the second and more critical point is once you make that leap away from multi-member commissions, there's no real clear limiting principle. Why should it make a difference? It seems the President is hemmed in even more. If for every one of those people, he can't remove them at whim. I don't understand why it doesn't go the other way. So there's one head, but with the multi-member, that each time, every one of them, the President can't do what he wants. Right, and for two reasons, Your Honor. The first is the point that I was just making to Justice Breyer. Once you make that leap to single-headed agencies, then Congress could impose a four-cause removal restriction just like the one in Humphrey's executor on most of the Cabinet, and that would be a wholesale revolution in separation of powers principles. Maybe Cabinet officials are different from an agency that Congress tries to make independent both of itself and of the President, to some extent. Cabinet members are loyal to the President. They carry out the President's policy in areas where the President has the authority. Cabinet officials are not like what Congress tried to create here, an agency that is independent of both branches of government. And Your Honor, that goes to my second point. This Court has made clear that separation of powers principles requires high walls and clear distinctions precisely because low walls and vague distinctions aren't traditionally enforced. I don't know that you can say anything additionally, but it's a very basic question. You have a document, and the document has to work. And different judges in this Court have taken somewhat different approaches. But the approach of workability in terms of what Congress wanted in the other provisions does not lead you to a clear standard. You are offering a clear standard, but my problem is, why that one? I mean, how long will that last? I don't know if there's anything you can add, but you see where I'm coming from. Well, I would like to add something, Your Honor, because I do think that we're offering a very clear standard. And at the same time, I would like to finish responding to Justice Ginsburg's point, because the Cabinet is nowhere defined. The Cabinet is simply a matter of tradition. The reason why particular agencies are in the Cabinet is typically because they're removable at will. But once you say that you can impose for-cause removal restrictions on agencies that are functionally no different than the FTC other than in their multi-member structure, you really no longer have defined a limit on when Congress can impose a similar restriction. And if you go down that road, Your Honor, you can effectively saddle every new president with his predecessor's Cabinet, much like this administration was saddled with its predecessor's head of the CFPB. I'm not sure, General, that you responded to the part of Justice Ginsburg's question, which again focused on this principal argument that you're making, which is the multi-member versus the single member. And I think she was saying that even if you could make a generalization, which I think that there are problems with, but even if you can make a generalization, it cuts the other way, that a multi-member commission, just because it diffuses power, is much more difficult to influence. If a president can get one person on the phone, that's a lot easier than if he has to worry about seven people who are all doing their own thing. And so just the basic understandings of one person, easy to influence, more accountable, even if you can't influence him, you can point at him. Why isn't a single member agency better? So my first answer to that is, even if I assumed for the sake of argument that what you were saying was right, and I don't agree with it, I don't think it would matter. Because the rationale of Humphrey's executor is that the four-cause removal restriction was allowed because the agency was quasi-legislative or quasi-judicial. And by that, I think what the court meant was that it was a multi-member body that acted through deliberation and consensus. And that rationale simply doesn't apply to single-headed agencies, even if you thought it was the same diminution of power. If I could give you an example to help illustrate the point, based on Morrison against Olson, I doubt, I very much doubt this court would uphold an independent counsel statute that was trained in on the investigation of private individuals, even if it were a very small number of private individuals, and even if this court thought it resulted in less of a diminution of executive power than the independent counsel statute at issue in Morrison, precisely because the rationale for Morrison wouldn't apply. There wouldn't be the need to prevent the perceived conflict of interest when the executive branch investigates itself. So even if you thought it was a lesser diminution of executive power, because the rationale of Humphrey's executor doesn't apply, it wouldn't justify the extension of Humphrey's. But now I'd like to address also why I disagree with your fundamental point. The first is the no limiting principle point, and I'm not going to go further into that because I've already said it. The second is multi-member commissions actually, in my view, represent less of a threat to liberty precisely because they are multi-member bodies that act through their power. For a single-headed agency, often the only restraint on the exercise of power is a political or democratic accountability restraint. And once you remove that, you've now vested enormous executive power in somebody who is not subject to the procedural constraint that multi-member commissions have and are not subject to the political constraint that everyone else has. What strikes me about a lot of these arguments in the brief and here, and you're saying this is the better way to promote liberty, to protect liberty. I mean, traditionally, there's been a long history of saying that it's actually the political branch's decision as to which is the best way to promote liberty. This is a constitution that does not say anything about removal. It does not say anything about for cause or at will or anything else. Indeed, it doesn't say anything very much about the structure or organization of the government in general. It essentially allows it to Congress with the president. The president has to sign these laws to decide which institutions of governance and which modes of governance are best to promote liberty and to serve the public interest. And I don't know how to make these decisions. They're contested. They're contestable as to what independence and what form of accountability and what form of presidential control is appropriate. Why don't we just leave it to the political branches who actually know about these things? For a couple of reasons, Your Honor. And the first thing I'd say is I do think the constitution specifically addresses this question, though not in so many words. And what I point you to is exactly what this court said in the Free Enterprise Fund case. The view that prevailed, talking about the decision of 1789, as most consonant to the text of the constitution was that the executive power included a power to oversee executive officers through removal. Now, as to your liberty point, the reason why I don't think that the courts leave this just to the executive branches is because the purpose of separation of powers is not to protect the president from Congress or to protect Congress from the president, but to protect the liberty of the people by enforcing the structural constraints of our constitution. And the key structural constraint at issue here is the one set forth in Article 2, that the executive power shall be vested in a president and that he shall take care that the laws be faithfully executed. The only way he can do that is if he's fully accountable for the decisions of his principal officers. And the problem with these four cause removal restrictions is that they vest executive power on individuals who are not ultimately accountable to the people through their duly elected president. Is your argument stronger or weaker when you look at the budgetary constraints? I mean, does the independence of the agency from the budgetary process further weaken the democratic accountability through the president, or does it give him at least some say in the agency's functioning? Well, Your Honor, respectively, I think that that gives the president less control, but that's not the focus of our argument. Ultimately, it's the president's duty to oversee the principal power, not Congress's duty to oversee the executive branch through the appropriations power. So I think that additional insulation marginally helps us, but I wouldn't rely on that here. How much does it matter that the tenure of the single director continues into the next president's term? Because I think that's when the problem really reveals itself, that the with a CFPB director appointed by this president and will not be able to supervise or direct that person, even if that president has a wildly different conception of consumer financial protection. I think that helps illustrate the fundamental nature of the problem in that, and it doesn't just have to do with timing. If you've got a president and a Senate of the same political party, they could also game the system by just putting in place a new CFPB director at the very end of the president's term. So I think that the current director will go to the end of 2023, correct? So the first three years of the next term. I think that illustrates the nature of the problem, Your Honor. Even if you didn't have that, I still think this forecaused removal restriction. But I mean, Justice Gaffney raises a really interesting point here, because the court has been so focused, all our cases, on removal. But removal is really not the thing, that if you wanted to pick one thing, you would pick appointments as reflective of whether a president will have control or not control over a particular person. So, you know, it's appointments, it's length of term. There are so many things that go into the question of presidential control. Removal has historically been very difficult for presidents to exercise as a way of controlling people because the people you want to remove the most, there are all kinds of political constraints about why you shouldn't remove them. So removal is like a nuclear bomb. There are all kinds of things that actually figure in how much control a president has over an individual that have nothing to do with removal. Why is it that we've picked this one thing as the sine qua non of Article 2? Because respectfully, Your Honor, I would very much disagree with the entire premise of your point. And I point you to the court's decision in Boucher, where the court wrote that once an officer is appointed, it is only the authority that can remove him and not the authority that appointed him that he must fear and in the performance of his duties obey. And as this court made clear in the Free Enterprise Fund case, the removal power is the principal power that the president uses not only to supervise the executive branch, but to ultimately be held accountable to the people, which is, after all, the whole point. I would like to address the severability issue, which is very important to the government. If the court doesn't address the severability clause, as my friend has suggested, then there really is a cloud hanging over everything that the CFPB does. If, as we contend, the removal restriction is unconstitutional, and if it is inseverable from the remainder of the statute, then everything that the CFPB does is invalid, and they don't even have the authority to ratify the CID here. So we think it's critical that the court address that question, and I would also respectfully submit that it is a very easy question in this case in view of the clear and unambiguous severability clause. There's no need to engage in this navel-gazing, what would Congress have done had it considered the issue, because Congress has answered that question. Well, Mr. Chairman, again, I'm sad to look at all the provisions of the statute, and those reveal an intent that is distinct from the severability clause. So can you respond to his point on that? Yes, two responses, a specific one and a general one. On the specific one, he points to a provision that simply refers to the CFPB as an independent bureau. All that really means is that while it's housed under the umbrella of the Federal Reserve, it is independent of the Federal Reserve Board. It is a separate and independent agency, just like the Department of Education is a separate and independent agency. But in any event, there is nothing that they point to that can overcome the clear and unambiguous text of a severability clause that says if any provision is found unconstitutional, then the remainder of the statute shall remain intact. Well, I take your point about the severability clause, but if what you say is true, then what would be the justification for this Court's statements in other cases that a severability clause like this is not necessarily dispositive? Well, Your Honor, first of all, I point to what Justice Kavanaugh was alluding to. Those cases are often from an earlier era, but I will put that wholly to the side because at the very least, it is a strong presumption. And it's a presumption that can be overcome only if there is an internal statutory conflict. If, for example, severing a provision would render the statutory scheme incoherent. Here, one of Congress's principal purposes was to take a consumer protection function that was spread out across multiple agencies and concentrate it into a single agency because they thought that would lead to better and more effective enforcement. May I have one more sentence? One more. And by severing the four-cause removal restriction, you leave fully intact that concentrated enforcement mechanism. Thank you, General. Mr. Clement? Mr. Chief Justice, and may it please the Court, text, first principles, and precedent all support the validity of the removal provision at issue here. Nonetheless, the parties are in violent agreement that the provision is unconstitutional. Moreover, they are eager, indeed hungry, to borrow a phrase from Justice Scalia's Windsor opinion, to have this Court decide the constitutional issue on which they agree. But if they agree, it's reasonable to ask, why doesn't the government give Petitioner what it wants and drop the CID? Ah, but there's a rub. The President and the executive branch acting through the President does not want the CID dropped, which is why the acting director, when he was removable at will, ratified the investigatory demand here and told the Ninth Circuit that that ratification was an independent, non-constitutional basis to resolve the entire case. The Solicitor General, at page 22 of his reply brief, continues to argue that the ratification precludes any relief for the Petitioner. Yet he insists that this Court should decide the constitutional question because the parties somehow agreed at the cert stage that ratification would be saved for the Ninth Circuit. Thus, this is a case, unlike Windsor, for example, where the lack of adverseness between the parties is fundamentally distorting this Court's ability to do its job and its general preference to decide cases on non-constitutional grounds rather than wading into difficult constitutional questions. There is a phrase that aptly describes what the Solicitor General wants from this Court, and it's an advisory opinion. And this Court were to reach the merits, it should affirm the decision below and the constitutionality of removal provision that uses the same familiar phrase that this Court has approved on other occasions, and leaves the removal power with the President, which avoids the principal defect in this Court's cases. My friends want to describe this Court's precedence as providing a general rule of illimitable presidential removal power, subject only to a narrow exception for multi-member commissions. With all due respect, that is wishful thinking. The general rule that describes all of this Court's cases is that the Congress cannot assign the President's removal authority elsewhere, whether it's Congress. Mr. Clement, I understand your point about ratification. I think if the other side were to have had an opportunity to respond, they might say something like this, that we don't normally decide questions in the first instance that haven't yet been adjudicated below. We're a court of review, not first view, I think is the phrase I often hear. What would you say to that? I would say, Justice Gorsuch, that might be a reason to dismiss this case as improbable. So you're arguing, you're really arguing that we should dig the case? I'd say if the choices are dig the case... That's your first argument. ...or decide, well, it's not strictly a dig argument. The way I would think about it is this Court in Windsor, over a strong dissent by at least three justices, said that it could decide that case jurisdictionally, even though there was a lack of adverseness between the parties. But even the majority was concerned with that lack of adverseness between the parties, and it suggested it was a prudential test, and you looked for whether there was a prudential reason to decide the case or not to decide the case. Here I think there is, with respect, the mother of all prudential reasons not to decide this case. So I think the answer to the question is yes, right? You'd dig the case. That's your first choice. The mother of all prudential reasons not to decide it, I would take that to mean we should dig it, no? No, Mr. Justice Gorsuch, I think you should write a fine opinion that vindicates much of the reasoning of the dissenters in Windsor, but reconciles it with the majority. And it's not a dig, it's a jurisdictional opinion, and it says adverseness is vitally important to Article III, and it's vitally important especially when the lack of adverseness could cause this Court to unnecessarily decide a constitutional question. Boy, that sounds a lot like a dig, but okay, fine. On the merits, what do we do with the fact, and I'm sure you've given this great thought, that if we were to approve single We would run into questions about the Cabinet, for example, which are just agencies, right? So how would you have the Court write an opinion to distinguish this case from that? So I want to be responsive, but I want to point out that I don't say— Great. But just to point out, at starters, you don't avoid drawing a line by adopting the Solicitor General's provision. I understand that. Okay, because I don't— But now if you could answer my question. Sure. So I would draw it the same place I think he would draw it. So I don't think he would say that you can eliminate the State Department by creating a multi-member Commission on Foreign Affairs. That's not my question, Mr. Clement. If you could answer my question, I'd be grateful. My question is, what if Congress tomorrow revived the Tenure in Office Act, all right, and said presidents can't remove without a whole bunch of conditions—not Senate approval, okay, but something else that looks a lot like that. Wouldn't that be a problem with the Constitution? Absolutely. Okay. Then how do we distinguish this case from that one? So I think there's two—I offer you two limiting principles, which I think is two more than the Solicitor General's offered you. But here's the first. The first is— If you could avoid disparaging our colleagues and just answer my question, I would be grateful. First, there is a structural limitation. So they can't put somebody essentially in the White House staff and then have that person subject to—for cause removal. Second, there's a constitutional backstop, an absolute constitutional backstop, which is those authorities that the Constitution assigns directly to the president—so the State Department, the Defense Department, pardon power, there's a few others—those cannot be subject under any circumstances to anything other than at-will removal. How about— And I didn't mean to disparage my colleague. I was just saying the same limiting principle ultimately has to be in place for multi-member commissions. How about the EPA or Homeland Security? So I think EPA is something that they probably could make subject to for cause removal. I think Homeland Security in its current form, they couldn't, because some of the powers that were given to the Homeland Security Secretary by Congress were powers that were borrowed from the Defense Department. And I think if any of the authorities that are being exercised by a Cabinet Secretary are authorities that the Constitution assigns directly to the president, you probably can't make that subject to— Well, what is your definition of a Cabinet Secretary? I would take the definition for these purposes directly from 5 U.S.C. 101. That's where Congress defines the 15 executive departments. They are the 15 executive departments that are in the line of succession. That would be my place. Those change from time to time, right? Relatively rarely. I mean, the last time we had one added was the Department of Homeland Security. And my point is a structural one that works with a constitutional backstop. The point is Congress can't sort of try to have it both ways and say, we don't really want this person to be independent, we just want to sort of hamstring the president. But ultimately there is a constitutional backstop. And I think it's the same backstop that you would have to eventually put in place for multi-member commissions. And that's when you began by saying that was a narrow exception that the Solicitor General adopts. Why is that? I mean, most of these agencies are multi-member commissions and they seem—most of the more significant ones are multi-member agencies or commissions. I would have thought that's a fairly significant exception. Well, Mr. Chief Justice, the Solicitor General described it as a narrow exception, however broad it is. I don't think, though, it's a coherent place to draw the line. And that's because if you think of what the agencies are doing as exercising executive power—and I don't think there's any other way to think about them, and this is how Chief Justice Rehnquist thought about them in Morrison—if they are exercising executive power, then this Court has held for nearly a century that you can have principal officers exercising executive power subject to inefficiency, neglect of duty, and malfeasance removal provisions. So there isn't some absolute sort of prohibition on that. Then the question is, is there something sacrosanct about a multi-member commission? And the answer, I would think, for purposes of this argument is absolutely not. And actually, if the constitutional problem is that somebody is exercising the executive power with a for-cause removal restriction, I think it's more problematic if they're subject not just to for-cause removal, but a multi-member requirement and a partisan balance. But Congress has always established these as multi-member commissions or agencies. And as the Free Enterprise Fund decision said, as Noel Canning said in a different context, recess appointments, Justice Breyer's opinion, that historical practice at some point becomes an important aspect of how we define or draw the line. So what do we do with that historical practice here? Well, I think what you do is you take the historical practice as a given, so you don't overrule Humphrey's executor, despite the invitation to do so. But then you think, okay, now we confront something that's different, not completely unprecedented—we've had four of them spanning about 30 years—but you confront something new. And then you say, is this different in kind? And here's—on the different in kind, just how this will play out if you were to win, it's really the next president who's going to face the issue, because the head of this agency will go at least three or four years into the next president's term. And the next president might have a completely different conception of consumer financial regulatory issues, yet will be able to do nothing about it. And this director—and that's different from the FCC and the FTC and the NLRB and you name the rest, because the chair is redesignated by the new president when the president comes in. That happens with all the, or almost all the, multi-member agencies. So how do we deal with that real-world consequence that seems different and troubling? So two points, Justice Kavanaugh. First, I don't know that's different with respect to many of the important agencies. And I point, for example, to the Fed. I don't think the president has the ability to just change who's the chair of the Fed as soon as they walk into office, and they may not even be able to make an appointment to the Fed for a couple of years. And so I think, as Justice Kagan alluded to, there is a number of different forms of multi-member agency. But second, I think that gets to the question that the Chief Justice asked earlier in the argument, which is, it depends a little bit about what inefficiency, neglect of duty, and malfeasance mean. I mean, if that's something that basically means that you have to have a very high standard before you can remove somebody, then maybe there is more of a constraint in that situation. If it means something slightly less, there may be less of a constraint. And you're not drawing on a blank slate in that regard. My friends on the other side act as if this were... I'm sorry to interrupt, but if we water down the standard, as you're suggesting, of what it takes to remove an independent agency head, that would apply across the board and actually would be a broad holding that would make the FCC, the FTC, NLRB less independent. I think it depends. I mean, if you're interpreting those terms to avoid a constitutional problem and the particular constitutional problem you just articulated, then I don't think it necessarily follows that those same terms would be watered down in the context of the multilateral... What about the budgetary consequences? I mean, your friend on the other side refers to this individual, the head, as sort of like the effective president over the significant swath of the economy. But with the budgetary things, it's actually more powerful than that. I mean, they don't even have to go to Congress to get their money. Isn't that something that we should factor in to the substantive question on his removability? Well, Mr. Chief Justice, I think that actually cuts in our favor because that means that the officer is less responsive to Congress, and therefore, however responsive they would otherwise be to the president, they don't have to dilute that by trying to worry about what they're going to say to the appropriators when they go up and talk to the appropriators. And I think that the Solicitor General referred to the Bousher opinion. I think the Bousher opinion is helpful for us for two reasons. First, it interprets inefficiency, neglect of duty, and malfeasance in a way that I think if applied to this statute would make it constitutional. But second, it also points out that the critical principle is that an officer is drawn kind of in a magnetic way to the individual that has the ability to remove them. And here, unlike Bousher, unlike Myers, and even unlike Free Enterprise, the person that gets to remove the director is the president. So the director has to be to some degree, even when there's a change of administration, responsive to the is what I said. Would it be enough for the president to say, I don't feel that your mind and my mind go along together on the policies or administering of the agency? I don't know that that would be enough, Your Honor. But I do think if a president said, look, I think it's an important priority for consumer finance protection that we deal with, let's just say, payday lenders or some problem that's out there. And the director said, absolutely not. I think you could, especially if you're right. That's what President Roosevelt said to Humphrey. No, no, what you said is what you're saying is really the same thing. I don't think it is what he said. And I mean, keep in mind, in Humphrey, you had those terms, but you upheld the constitutionality of the statute. Yes, but what's the difference if we water it down to something approaching at will? What's the difference between that and overruling Humphrey and being honest about what we're doing, Mr. Clement? Well, two things, Your Honor. I mean, first, in every other context I'm aware of, if you have one path that says we interpret the statute to avoid the constitutional problem, or we could strike it down, you favor the non-constitutional ruling. Yes, but what you're doing is equating the two. If it winds up being at will, then that is Humphrey. With all due respect, I think that there's still a difference. Whatever the standard is, maybe it allows something like sort of a broad-standing policy disagreement, but not disagreeing with individual cases. A broad-standing policy disagreement versus a policy disagreement in a particular case. I'm sorry, Chief. I'm not sure what the difference would be. Well, one is, I want you to go after payday lending. The other is, I don't like what you did in that particular adjudication. Well, but that's worse than Humphrey, because what's going to happen is that there will be litigation over whether or not the standard has been met or not met. I mean, we begin with the idea of a serious conflict between the president and the agency director. And if then we're saying, well, the standard is more flexible, it sounds to me like that's a dispute that's going to be presented to the courts, which would be the worst of all possible worlds. No, first of all, I don't think it would be the worst of all possible worlds, because it would be a concrete, live dispute. And of course, as you suggested, you could provide a degree of deference. But I do think it's important. There would still be a big difference between a restriction that applied, however you interpret it, and at will. In concrete terms. So let's say that the director is appointed by a prior president and the new president says, I want to remove you because I think you are too pro-consumer and you're hurting the economy, or you're not sufficiently protecting consumer interests. Would that be permissible? I don't know for sure, because I don't have a concrete controversy here. And that's maybe just yet another reason to not decide this case in its current artificial posture. But I guess if you told me... No, that's exactly, that's all we know about it. There's just a policy disagreement about the way interests are balanced. Would that be sufficient to remove that person? If the only alternative is to strike the statute down, I would say that's sufficient. Now, I will confess, I don't think that's what Congress had in mind when it put those words in this particular statute. And I think as written, it's still perfectly constitutional. I'm just saying, in every other context, the rule this court applies is we interpret the statute to make it more constitutional, not less constitutional, just so we can strike it down. Mr. Clement, can you say or explain what your counter is to the buckstop seer argument? There seems to be an overriding assumption that somehow the president needs unfeathered discretion to execute the laws. Why is that? Answer that argument head on. So I don't think that that's true as a constitutional matter with respect to every power the president exercises. I think Congress has the power to say, there are certain things where we want the president to have a role, but we also want it somewhat insulated from politics. So take the Fed, for example. We don't want the president to juice up interest rates right before a presidential election, so we're going to give that to somebody who is insulated. How insulated depends on what's constitutionally permissible. But not every statutory responsibility needs to be conducted by the president himself. In the current situation, you see people are trying to make a political football out of dealing with a pandemic disease. So maybe Congress decides, you know what makes sense? Let's have the head of CDC be protected by four cause removal, because that'll make sure people get good advice and it doesn't become political. That is the kind of sensible decision that Congress has been making for over 100 years. Now, it gave that responsibility, that important responsibility to the Fed, protected by four cause removal 100 years ago. Now, it happened to be a multi-member board of governors, but I don't think anything turned on that. As the House makes clear in their amicus brief, at no point did Congress ever put multi-member restrictions in there or bipartisan requirements in there to give the president greater control. Although the reality is diverse as a general matter, if you add multi-member requirements and partisan balance requirements to four cause removal requirements, you make the officers more insulated, not less insulated. The buck stops here quote was quoted in our recent decision in free enterprise. Do you think that that should, that recent precedent should have a binding effect on how the court addresses this case? May I answer? No. Yes, you may. Mr. Chief Justice, we think free enterprise fund helps us in two ways. One, it made crystal clear that the defect there is that the removal power was taken away from the president. And what you found to be sufficient to give the president control there was the ability to remove the SEC commissioners for cause. The second thing you said later in the opinion is that the SEC itself, the whole multi-member commission could actually function as a head of the department. So that's an appointments clause context. It's a way of saying the difference between a single member and a multi-member doesn't make a constitutional difference. Thank you, counsel. May I just ask one question? Mr. Shanmugam said there was no proof of ratification. Well, I don't know what he means by that. The acting in a brief that said that it was essentially endorsed by the acting director at a time when the acting director was in charge and at will removable by the president told the ninth circuit that the acting director had ratified the decision to issue the CID in that context. I would take that as in any other context is all evidence you need. Thank you, counsel. Mr. Letter, Mr. Chief Justice, and may it please the court, let me begin just by saying the Speaker of the House thanks the court for its courtesy in agreeing to let the House be heard here today. I'd like to start out, if I could, by responding to Justice Gorsuch's question to my friend, Mr. Clement, about do we want the court to dig the case? No. We think that the court should affirm on alternative grounds because, as we have pointed out, there are two reasons why this court's venerable doctrine, with which the House completely agrees about avoidance of constitutional issues, one is the ratification point that we've been discussing, and two is the severability point, which this court, in cases like Matthews and Chadha, has indicated you can look at first, initially. And here, the severability point, we think, is absolutely clear because of the severability clause. But in addition, there's another point that I wanted to make that hasn't yet been said. If there is no severability here, I want to make sure that you all understand this is not a simple situation of, well, we'll just have these functions go back to the other agencies where they came from. They came from seven different agencies. The Office of Thrift Supervision no longer exists. The other agencies don't have either slots or appropriations to enforce what the CFPB does. So if you say this is non-severable, we strike down the whole statute. In this instance, that would be a very, very major action. Mr. Leder, are you quite concerned about the agency taking away your clients' authority over the budget with respect to this very significant part of the economy? We are not, Your Honor, because this is something that Congress has done with several agencies in the financial regulatory sectors. For example, the Fed, in particular, the National Credit Union Administration. So this is a function that, oh, I'm sorry, the FDIC. This is something that Congress has done and the presidents of the political branches have done in different agencies within this financial regulatory sector. As far as one of the things I'd like to pick up on also is Justice Kagan's point or question about is it really so simple about agencies with multi-members or an individual. And I know, Justice, as Judge Kavanaugh, you wrote extensively on the influence, but I'm going to try to press hard and convince you otherwise. The situation here is if the president were to try to, by removals, influence the kinds of functions that the CFPB does, you'd have to make removals possibly from seven different agencies, any number of individuals. And then the point that was made about, well, there haven't been many removals. It's a big deal. It is a big deal. And that's why there have been almost no removals. In fact, what we know from history is presidents have all sorts of ways that they influence agencies and they influence agency commissioners or heads. Just as, for example, sometimes you might have a situation where a president convinces a Supreme Court justice to leave that post. What do you have? Do you want to add anything on what I think is quite basic and people disagree? On the one hand, you have people, good walls make good neighbors. Let's look for a line, Maldiva versus single or some other line. The other is the approach. There's something about me that doesn't like a wall. And before I want to have a wall, I want to know what I'm walling in and walling out. And that looks to function. What did Congress have in mind? How does it wall in the president? What is it exactly the agency is doing? The difficulty of that, of course, is there is no strict line and the courts have to approach it without knowing too much about it, by case. Do you have anything you want to say on what I'd call that basic difference of approach in these cases? Yes, Your Honor. And you're absolutely right. This is a basic difference here. The point is that we do not agree. I do not agree with Mr. Clement's argument that we should tried to have cabinet members be anything other than at will. And I think my friend, Mr. Clement hit on a very key provision. One is the succession, the cabinet members who are in the succession, not all cabinet members are succession to the president, but two, the basic independent powers that the president has because of the constitution. So it's not just the defense department as much. So would you draw the line, Mr. Letter, then? I guess I have two questions for you. First, if the standard isn't watered down, what does that standard mean for removal in your mind? And number two, what would be the stopping point for Congress's ability to place high levels, serious impediments to presidential removal powers of members of cabinet and what we think of traditionally as executive agencies? Your Honor, I'm going to start with the second one. I don't know the answer of how far Congress could go, Congress and the president together. That's a pretty vital question for us to be able to answer to decide this case. I don't think so, Your Honor, because you have decided in Humphrey's executor, Wiener, Buckley, Free Enterprise, Morrison versus Olson. You've decided all of those cases and you've said that removal protections are constitutional without answering that question. I searched in vain. In none of those decisions have you... No, fair enough. But you're at the podium. So take a shot at it. I'm going to pick up on a word that I believe this court has used, which is they should be modest. I think the test is, Your Honor, what again, this court has said, I believe it's in Morrison, but you've said it in various situations. Does it so interfere with the executive's ability to carry out his constitutional responsibilities? That's the test that this court has said in a than what you have said. What do you do about... I'm sorry, go ahead. I hope you'll get to my first question at some point, but I'll go ahead. Justice Gorsuch, would you mind repeating your first question? I apologize. Sure. What does that removal standard mean to you? If we shouldn't water it down, what does it mean? Your Honor, and again, I'm going to agree with Mr. Clement insofar as this, a lot of times this is going to depend on context. So for example, and again, this court hasn't defined what it means. So I don't have a great answer yet from you all. You tell us what... Your client wrote it. So I'm just wondering what your client's view is. And you say you disagreed with Mr. Clement on this, and now you say you agree. So I'm really quite confused. I disagree with Mr. Clement about watering it down. We don't think that it should be made basically at will. But the... I don't think Mr. Clement said that either. Oh, I apologize. I thought he was saying a watered down version, but Justice Kagan, I will very strongly agree with Mr. Clement. It does depend on the circumstances. For example, if a president says, I'm firing you because you are investigating one of my big anybody would feel that that fits within the I M N standard. So what if the president just says we don't agree on policy? Would that be permitted? I don't believe... I think in free enterprise, I believe you said no. So I think you've already answered that. So we don't always think about the future implications of these things, but that's one of the things I've tried to think about. The next president in 2021 or 2025 or whenever will have to deal with a CFPB director appointed by the prior president, potentially for his or her whole term without being able, given your answer to Justice Alito, being able to do anything about that difference in policy. You comfortable with that result? Does that give you any concern? Should we be concerned about that? It does give me concerns, but, and I'm very glad you brought that up because you've asked that and it's a very key question, Your Honor. What I would say though is let's compare it to, for example, may I finish mine? Sure. If you compare it to, for instance, the Fed that has seven members who serve 14 year terms, a president who serves a four year term is therefore very likely to have almost no influence over the Fed. I'm not a good mathematician, but I don't think that means that they get to come anywhere close to appointing a majority of the Fed members. So this is a problem that you have already decided to recognize. Mr. Lederer, I think Justice Gorsuch's first question is still on the table. As I said, what we think it means will be fact dependent. It will depend, as I say, if it is, it can't just be, we have a policy difference. You've already, you've told me that. You've already told me that it can't simply be, I don't like you. We know that. But for example, if it's a situation where the president says you are doing something that undermines national security, one of my core functions, or undermines foreign relations, and I want, and I direct you to stop, an agency that says no, I believe that that would be, Your Honor, a cause for, that would meet the standard. Thank you, counsel. Thank you, Your Honor. Two minutes, Mr. Chamberlain. Thank you, Mr. Chief Justice. Just three points on jurisdiction, the merits, and the remedy, respectively. On jurisdiction, amicus who is appointed to defend the judgment below now seems primarily to be arguing that this court made a mistake in granting certiorari because of the existence of the ratification question. As a preliminary matter, that was flagged by both sides at the cert stage, and this court nevertheless granted review, and I would respectfully submit for good reason, ratification goes at most to the remedy for the constitutional violation here. And that issue was obviously not briefed before this court. It was raised by the government in the Ninth Circuit, but notably, unlike in the other cases involving challenges to the CFPB's constitutionality, the government provided no factual support, no declaration, nothing in support of ratification. I think the ratification is deeply legally problematic here, too, and I would refer the court to the amicus brief of RD legal funding if the court has questions about that, and ratification wouldn't solve the constitutional problem because even if the CID itself had been ratified, the continued prosecution of this enforcement action would still present exactly the same constitutional concern. Now on the merits, amicus disparages the notion that the removal of power is illimitable. Ironically, the court used exactly that adjective in Humphrey's executor, at least where agencies are performing executive functions. No one defends the rationale of Humphrey's executor distinguishing between executive functions and quasi-legislative or quasi-judicial functions, and our approach gives meaning to Humphrey's executor and allows the court to leave it in place by limiting it to the multi-member context. Amicus's proposed approach, by contrast, would really create an exception without limit, and the exception cannot be limited to cabinet officers because for those cabinet officers who exercise enumerated constitutional responsibilities, that's only two, the Secretary of State and the Secretary of Defense. All 13 of the other cabinet officers, as the cabinet is currently constituted, would be removable. The judgment of the Court of Appeals should be reversed. Thank you, counsel. Mr. Clement, this court appointed you to brief and argue this case as an amicus curiae in support of the judgment below. You have ably discharged that responsibility, for which we are grateful. The case is submitted.